UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA

v.

ZEUS LINES MANAGEMENT S.A.,

Defendant.

Criminal Case No. 1:23CR28MSM-LDA-01 _____

## PLEA AGREEMENT

1.    Defendant agrees to waive Indictment and plead guilty to Counts 1 and 2 of

an Information charging Defendant with:

Count 1:

On or about February 19, 2022, within the navigable waters, internal waters, and ports of the United States in the District of Rhode Island, ZEUS LINES MANAGEMENT S.A., the defendant, acting through its agents and employees, did knowingly fail to maintain an accurate Oil Record Book for the Galissas. Specifically, the defendant maintained an Oil Record Book that failed to record discharges of oily bilge water from the Bilge Holding Tank directly into the ocean. All in violation of Title 33, United States Code, Section 1908(a); and Title 33, Code of Federal Regulations, Section 151.25.

Count 2:

On or about February 19, 2022, within the navigable waters, internal waters, and ports of the United States in the District of Rhode Island, ZEUS LINES MANAGEMENT S.A., the defendant, acting through its agents and employees, did knowingly fail to immediately report a hazardous condition on the Galissas to the U.S. Coast Guard. Specifically, the defendant failed to immediately report that the vessel's inert gas system was inoperable while the vessel's cargo tanks were not gas free. All in violation of Title 46, United States Code, Section 70036(b); Title 46, Code of Federal Regulations, Section 32.53-5; and Title 33, Code of Federal Regulations, Section 160.216(a).

1

2.      Defendant shall be represented by an authorized representative and by counsel (counsel may be the authorized representative) and shall appear in open court and plead guilty to the two-count Information pending in this case. By entering into this Agreement, Defendant waives any right to have the facts that the law makes essential to the punishment either charged in the Information, proved to a jury, or proven beyond a reasonable doubt.

3.      In furtherance of this (or related) prosecution(s) Defendant shall:

(a)      truthfully and completely disclose all information with respect to the activities of the company, its present and former officers and employees, and others concerning all matters about which the Government inquires of it;

(b)      cooperate fully with the Government and any other law enforcement agency designated by the Government;

(c)      at the request of the Government, use reasonable efforts promptly to secure the attendance and truthful statements or testimony of any officers, agents, or employees at any meeting or interview, before the grand jury, or at any trial or any court proceedings;

(d)      promptly provide the Government, upon request, any document, record, or other tangible evidence relating to matters or conduct about which the Government or any designated law enforcement agency inquires;

(e)      bring to the Government's attention all criminal conduct by or criminal investigations of the company or any of its employees (to include senior management) that come to the attention of the company's senior management, as well as any administrative proceeding or civil action, brought by any United States Governmental authority that alleges violations by Defendant;

(f)      file no motions, make no statements, or take any position whatsoever in relation to any motion that the Government may file regarding a request or

2

recommendation to the Court for an award to be paid to any persons pursuant to 33 U.S.C. § 1908(a); and

> (g)    not retaliate against any crew member on account of their cooperation with the investigation and prosecution of this case.

4.    Defendant agrees that this agreement will be executed by an authorized representative.

5.    The parties have previously executed an Agreement on Security which provides for, among other things, the maintenance of certain crew members. This Agreement on Security remains in effect until final disposition of this matter and related matters.

6.    The Government agrees to (1) defer any other charges based on the same conduct, and (2) not prosecute Defendant thereafter on such deferred charges unless Defendant breaches the plea agreement, or the guilty plea entered pursuant to this plea agreement is set aside for any reason. If Defendant breaches this agreement or the guilty plea is set aside, section XII below shall apply.

## II

## NATURE OF THE OFFENSE

### A.    ELEMENTS EXPLAINED

The offenses to which Defendant is pleading guilty have the following elements:

Count 1:

1.    The commercial vessel Galissas was a foreign-flagged crude oil tanker of 150 or more gross tons;

2.    ZEUS LINES MANAGEMENT S.A., the Defendant corporation, acting through its agents and/or employees, was a person in charge of machinery space operations for which entries are required to be fully and completely recorded in the Oil Record Book;

3.      On or about the date charged, when the Galissas entered the navigable waters, internal waters, and ports of the United States, and while the vessel remained therein, the Defendant corporation failed to maintain an accurate Oil Record Book in which the transfers of oily bilge water and the discharges or disposal otherwise of oily bilge water were recorded as required by U.S. law;

4.      The Defendant corporation, acting through its agents and/or employees, who were acting within the scope of their agency or employment with the intent to benefit, at least in part, the Defendant corporation, acted knowingly.

Count 2:

1.      The Galissas was a foreign-flagged crude oil tanker or product carrier greater than 20,000 gross tons bound for a port or place within the navigable waters of the United States;

2.      ZEUS LINES MANAGEMENT S.A., the Defendant corporation, acting through its agents and/or employees, was a person required to immediately report the existence of a hazardous condition onboard the vessel to the nearest U.S. Coast Guard Sector Office;

3.      The Defendant, acting through its agents and/or employees, was aware of a hazardous condition onboard the Galissas, that is, that the vessel's inert gas system was inoperable;

4.      On or about the date charged, while the Galissas was bound for and when the Galissas entered the navigable waters, internal waters, and ports of the United States, the Defendant failed to immediately report to the U.S. Coast Guard the existence of the hazardous condition;

5.      The Defendant corporation, acting through its agents and/or employees, who were acting within the scope of their agency or employment for the benefit, at least in part, of the Defendant corporation, acted knowingly.

4

B.    ELEMENTS UNDERSTOOD AND ADMITTED – FACTUAL BASIS

Defendant has fully discussed the facts of this case with defense counsel. Defendant has committed each element of the crimes and admits that there is a factual basis for these guilty pleas. The Defendant admits the following facts and agrees that they are not a detailed recitation, but merely an outline of what happened in relation to the charges to which the Defendant is pleading guilty. The following facts are true and undisputed:

1.    The Defendant. Defendant ZEUS LINES MANAGEMENT S.A. was a company incorporated in Liberia with its principal place of business located at 48, Posidonos Avenue, 16675 Glyfada, Athens, Greece. At all relevant times, ZEUS LINES MANAGEMENT S.A. served as the operator of the crude oil tanker Galissas.

2.    The Vessel. The oil tanker Galissas (International Maritime Organization Number 9397781) was a 29,924 gross ton vessel, registered and operated under the flag state administration of Panama. The Galissas was engaged in international commercial maritime operations transporting cargo to and from Rhode Island, and elsewhere. The Galissas had a "Chief Engineer" assigned as the person in charge of the vessel's engine room, as well as a "Second Engineer," a "Third Engineer," a "Fourth Engineer," an "Electrician," and three "Oilers" who assisted the Chief Engineer. The crew members working in the engine room were responsible for, among other things, shipboard control of machinery space waste, to include oily bilge water. The Galissas had a Captain, also known as the vessel's "Master," who was the person in overall charge of the vessel. The Master was responsible for, among other things, the safe operation of the vessel and immediately reporting the existence of any hazardous conditions onboard the vessel to the nearest U.S. Coast Guard Sector Office. In addition to the Master, the Galissas had a "Chief Officer, a "Second Officer," and a "Third Officer," who assisted the Master. In all, there were 25 crew members working onboard the

Galissas, and all were agents or employees of ZEUS LINES MANAGEMENT S.A., the corporate operator of the Galissas, acting within the scope of their agency or employment with ZEUS LINES MANAGEMENT S.A. when serving onboard the Galissas.

3.    On or about February 02, 2022, while the Galissas was conducting cargo operations in Rotterdam, the Netherlands, certain crew members became aware that the vessel's inert gas system was inoperable. The inert gas system is necessary to ensure that oxygen levels within the vessel's cargo tanks remain at safe levels (at or below 8%) and do not pose a hazardous condition. Rather than remaining in Rotterdam until the inert gas system could be repaired, shore side management of ZEUS LINES MANAGEMENT S.A. and the Master determined that the vessel should instead sail to the United States, where a spare part would be delivered upon the vessel's arrival for the crew to repair the system.

4.    On or about February 11, 2022, while the Galissas was transiting the Atlantic Ocean from the Netherlands to the United States, the Master submitted a required Notice of Arrival to the U.S. Coast Guard informing the Coast Guard of, among other things, the vessel's last port of call, next port of call (in the United States), and the type of cargo onboard the vessel. In this Notice of Arrival, the Master did not report that a hazardous condition existed onboard the vessel, that is, the inoperable inert gas system.

5.    On or about February 15, 2022, the U.S. Coast Guard sent an email to the agent of the Galissas stating that the vessel would need to be inspected when it arrived in Rhode Island. This email contained several questions the U.S. Coast Guard needed the Master of the Galissas to answer in preparation for the inspection. One of the questions asked what type of inert gas system was onboard the vessel. The ship's agent forwarded this email to the Master, and the Master responded via

6

email to all of the questions, without reporting that there was a hazardous condition onboard the vessel, that is, the inoperable inert gas system.

6.      On or about February 19, 2022, the Galissas arrived in the navigable waters of the United States off the coast of Rhode Island. As required, the vessel embarked a local ship's pilot to sail the vessel closer into shore. Along with the ship's pilot, the vessel's agent arranged for the delivery onboard the vessel of the spare part that had been ordered to repair the inert gas system. Although the vessel's crew received and installed the spare part, the inert gas system remained inoperable.

7.      On or about February 19, 2022, when the Galissas arrived in Rhode Island, the Master knowingly failed to immediately report a hazardous condition to the U.S. Coast Guard, that is that the vessel's inert gas system was inoperable while the vessel's cargo tanks were not gas free.

8.      The following day, on or about February 20, 2022, the U.S. Coast Guard boarded the Galissas. As the Coast Guard was beginning its inspection, the Master informed the inspectors that the vessel's inert gas system was inoperable. Upon hearing this, the Coast Guard inspectors took measurements of the oxygen levels within the vessel's cargo tanks and determined that the levels ranged between 15-17%, well beyond the maximum allowable 8%. The Coast Guard then ordered that the vessel be moved further offshore so as to not endanger the port of Newport, Rhode Island.

9.      The Master then spoke via telephone to the Operations Manager for ZEUS LINES MANAGEMENT S.A. and informed him of the situation. The Operations Manager told the Master to make a log that showed the oxygen levels. That log indicated that the cargo tanks were at safe levels when the vessel left the Netherlands and remained at safe levels during the majority of the vessel's transit

of the Atlantic Ocean, including on February 11, 2022, when the Master submitted the Notice of Arrival to the U.S. Coast Guard. In reality, the crew had not taken any readings of the oxygen levels in the cargo tanks during the vessel's voyage. The Master then tasked the vessel's Chief Officer with creating this fraudulent logbook, and the Chief Officer did as he was instructed by the Master. This fraudulent logbook was then presented to the U.S. Coast Guard during its inspection of the Galissas.

10.     On or about February 20, 2022, during the U.S. Coast Guard's inspection of the Galissas, and unrelated to the hazardous condition posed by the inoperable inert gas system, the Coast Guard noticed discrepancies between entries in the vessel's Oil Record Book and electronic data stored by the vessel's oil pollution prevention equipment.

11.     The Chief Engineer was interviewed by the Coast Guard and asked about discharges of oily bilge water. The Chief Engineer claimed that the oily bilge water from the vessel was properly discharged to shore facilities instead of being processed through the vessel's oil pollution prevention equipment. The Coast Guard interviewed other crew members working in the engine room, and they denied any knowledge of illegal bypassing of the vessel's oil pollution prevention equipment and discharges of oily bilge water.

12.     However, on three separate occasions between November 2021 and February 2022, the Chief Engineer ordered lower-ranking crew members working for him in the engine room to discharge a total of approximately 36.13 cubic meters (9,544 gallons) of oily bilge water from the vessel's Bilge Holding Tank directly into the ocean using the vessel's emergency fire pump, bypassing the vessel's required pollution prevention equipment. Crew members were also instructed not to discharge all of the contents of the Bilge Holding Tank because this would make the

8

records being maintained onboard the vessel look suspicious. In all, between November 22 and 25, 2021, approximately 22 cubic meters (5,811 gallons) of oily bilge water was illegally discharged; on or about January 12, 2022, approximately 10.41 cubic meters (2,750 gallons) of oily bilge water was illegally discharged; and between February 14 and 17, 2022, approximately 3.72 cubic meters (982 gallons) of oily bilge water was illegally discharged. None of these discharges were recorded in the vessel's Oil Record Book as required by law.

13.    During the January 2022 discharge, a crew member acting on the Chief Engineer's order discharged the entire contents of the Bilge Holding Tank (10.41 cubic meters (2,750 gallons)), accidentally leaving the tank empty. Concerned that this would raise suspicion, the Chief Engineer ordered the crew member to pump clean sea water into the Bilge Holding Tank. This crew member then pumped approximately 3.7 cubic meters (977 gallons) of clean sea water into the Bilge Holding Tank.

14.    In preparation for the U.S. Coast Guard's inspection of the Galissas in Rhode Island, the Chief Engineer held a meeting with his subordinates in the engine room. During this meeting, the Chief Engineer instructed his subordinates not to tell the U.S. Coast Guard about the bypassing of the pollution prevention equipment and illegal discharges of oily bilge water. Additionally, while crew members were waiting to be interviewed by the U.S. Coast Guard, the Chief Engineer approached several of them individually and reminded them not to tell the Coast Guard about the illegal discharges. Even after the crew members came ashore and were housed in a hotel in Rhode Island pending the investigation of this case, on several occasions the Chief Engineer told the crew members to stick to their stories and not tell the Coast Guard about the illegal discharges.

15.    On or about February 19, 2022, when the Galissas arrived in Rhode

Island, the Defendant knowingly failed to maintain an accurate Oil Record Book, in violation of 33 U.S.C. § 1908(a), as the above-mentioned discharges of oily bilge water were not recorded in the vessel's Oil Record Book.

## III

## PENALTIES

The crimes to which Defendant is pleading guilty carry the following penalties:

A.   a maximum five-year period of probation;

B.   a fine which is the greater of $500,000 per count or twice the amount of gross gain or loss;

C.   a mandatory special assessment of $400 per count; and

D.   an obligation to pay any applicable interest or penalties on fines and restitution not paid at the time of sentencing.

## IV
## DEFENDANT'S WAIVER OF TRIAL RIGHTS AND UNDERSTANDING OF CONSEQUENCES

This guilty plea waives Defendant's right at trial to:

A.   Continue to plead not guilty and require the Government to prove the elements of the crime beyond a reasonable doubt;

B.   A speedy and public trial by jury;

C.   The assistance of counsel at all stages;

D.   Confront and cross-examine adverse witnesses; and

E.   Testify and present evidence and to have witnesses testify on behalf of Defendant.

## V

## DEFENDANT ACKNOWLEDGES NO PRETRIAL RIGHT TO BE PROVIDED WITH IMPEACHMENT AND AFFIRMATIVE DEFENSE INFORMATION

Any information establishing the factual innocence of Defendant known to the undersigned prosecutors in this case has been turned over to Defendant. The Government

will continue to provide such information establishing the factual innocence of Defendant.

If this case proceeded to trial, the Government would be required to provide impeachment information for its witnesses. In addition, if Defendant raised an affirmative defense, the Government would be required to provide information in its possession that supports such a defense. By pleading guilty Defendant will not be provided this information, if any, and Defendant waives any right to this information. Defendant will not attempt to withdraw the guilty plea or to file a collateral attack based on the existence of this information.

## VI

### DEFENDANT'S REPRESENTATION THAT GUILTY PLEA IS KNOWING AND VOLUNTARY

Defendant represents that:

A.  Defendant has had a full opportunity to discuss all the facts and circumstances of this case with defense counsel and has a clear understanding of the charges and the consequences of these pleas. By pleading guilty, Defendant may be giving up, and rendered ineligible to receive, valuable Government benefits. The convictions in this case may subject Defendant to various collateral consequences, including but not limited to revocation of probation in another case; debarment from Government contracting; and suspension or revocation of a professional license, none of which can serve as grounds to withdraw Defendant's guilty pleas.

B.  No one has made any promises or offered any rewards in return for these guilty pleas, other than those contained in this agreement or otherwise disclosed to the Court.

C.  No one has threatened Defendant or Defendant's agents or employees to induce these guilty pleas.

11

D.    Defendant is pleading guilty because Defendant is guilty and for no other reason.

## VII

### AGREEMENT LIMITED TO U.S. ATTORNEY'S OFFICE DISTRICT OF RHODE ISLAND & ENVIRONMENT AND NATURAL RESOURCES DIVISION

This plea agreement is limited to the United States Attorney's Office for the District of Rhode Island and the Environment and Natural Resources Division of the United States Department of Justice and cannot bind any other authorities in any type of matter, although the Government will bring this plea agreement to the attention of other authorities if requested by Defendant.

## VIII

### APPLICABILITY OF SENTENCING GUIDELINES

This case is governed by the Sentencing Reform Act, as modified by *United States v. Booker*, 543 U.S. 220 (2005), and the United States Sentencing Guidelines, except that the fine calculations for environmental offenses are not governed by USSG § 8C2.1.

## IX

### SENTENCE IS WITHIN SOLE DISCRETION OF JUDGE

This plea agreement is made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C). The government agrees to present this agreement between the parties to the Court for its approval. In accordance with Rule 11(c)(4) and (5), the Court may accept or reject this agreement. If the Court accepts this agreement, then the Court will embody in the judgment and sentence the disposition provided for in Section X of this agreement, pursuant to Rule 11(c)(4) of the Federal Rules of Criminal Procedure.

## X

### PARTIES' SENTENCING RECOMMENDATIONS

A.    SENTENCING GUIDELINE CALCULATIONS

12

As stated above, this case is governed by the Sentencing Reform Act, as modified by *United States v. Booker*, 543 U.S. 220 (2005), and the United States Sentencing Guidelines, except that the fine calculations for environmental offenses are not governed by USSG § 8C2.1.

B.    NO FURTHER ADJUSTMENTS AND SENTENCE REDUCTIONS INCLUDING THOSE UNDER 18 U.S.C. § 3553

Defendant may not request or recommend additional downward adjustments, departures, or variances from the Sentencing Guidelines under 18 U.S.C. § 3553.

C.    "FACTUAL BASIS" AND "RELEVANT CONDUCT" INFORMATION

The facts in Section II.B of this agreement are true and may be considered as "relevant conduct" under USSG § 1B1.3 and as the nature and circumstances of the offense under 18 U.S.C. § 3553(a)(1).

D.    SPECIAL ASSESSMENT/MONETARY PENALTY/ RESTITUTION/_ FORFEITURE

1.    Special Assessment

The parties will jointly recommend that Defendant pay a special assessment in the amount of $400.00 per felony count of conviction (a total of $800.00). Special assessments shall be paid through the office of the Clerk of the District Court by bank or cashier's check or money order made payable to the "Clerk, United States District Court."

2.    Monetary Penalty

The parties will jointly recommend and request that the Court order Defendant to pay a monetary penalty of $2,250,000, consisting of a criminal fine of $1,687,500, and a community service payment of $562,500. This community service payment shall be designated as organizational community service pursuant to § 8B1.3 of the United States Sentencing Guidelines and in furtherance of satisfying the sentencing principles provided

for under 18 U.S.C. § 3553(a). Within 30 days of sentencing, Defendant shall make the community service payment of $562,500 to the National Fish and Wildlife Foundation ("NFWF") as provided below.

NFWF is a nonprofit organization established by the United States Congress pursuant to 16 U.S.C. §§ 3701-3710. Its purposes include the acceptance and administration of "property . . . to further the conservation and management of fish, wildlife, plants, and other natural resources," and the performance of "such other activities as will further the conservation and management of the fish, wildlife, and plant resources of the United States, and its territories and possessions for present and future generations of Americans." 16 U.S.C. § 3701(b)(1), (2).

NFWF is specifically empowered by Congress to "receive and administer restitution and community service payments, amounts for mitigation of impacts to natural resources, and other amounts arising from legal, regulatory, or administrative proceedings, subject to the condition that the amounts are received or administered for purposes that further the conservation and management of fish, wildlife, plants, and other natural resources." 16 U.S.C. § 3703(c)(1)(K).

NFWF is also required by its charter to submit to Congress annually a report of its proceedings and activities during such year, including a full and complete statement of its receipts, expenditures, and investments. 16 U.S.C. § 3706(a), (b).

NFWF shall use the community service funds paid by Defendant to fund projects, activities, or initiatives intended to benefit marine and coastal natural resources located in the State of Rhode Island. The types of projects, activities, and initiatives to be considered for funding by NFWF should be focused on, but not necessarily limited to, those intended to: (1) protect and restore salt marsh through creation of living shorelines, oyster reef breakwaters, and restoration of marsh hydrology and native vegetation; (2) restore beach and dune habitat through native plantings and management of human disturbance; (3)

restore freshwater wetlands, floodplains and coastal forest systems that reduce flood risk and improve water quality; (4) remove unnecessary dam structures and failing culverts that contribute to erosion and flood risks and serve as barriers to fish movement; and (5) replace hard or "gray" coastal infrastructure with green infrastructure that reduces polluted runoff, erosion, and flood risk.

NFWF shall use best efforts to obligate the community service funds to appropriate projects, activities, and initiatives within three (3) years of the date of entry of Judgment in this case. NFWF shall further report to the United States Probation Office for the District of Rhode Island and to the United States Department of Justice, on at least an annual basis, regarding the status and disposition of the community service funds it has received pursuant to this Section, until all such funds have been expended.

The Defendant shall remit the community service payment to NFWF by either certified check or electronic funds transfer. Certified checks should be delivered to the National Fish and Wildlife Foundation, attention Chief Financial Officer, 1133 15th Street NW, Suite 1000, Washington DC, 20005, and should include a reference to the case number in this proceeding. Payments via electronic funds transfer should be made in accordance with written wiring instructions provided by NFWF through its Chief Financial Officer or Senior Vice President, Impact-Directed Environmental Accounts, at the time of transfer.

The Defendant agrees and stipulates that the $2,250,000 monetary penalty amount is consistent with 18 U.S.C. § 3571 and that it has been properly calculated as representing twice the gross gain to defendant from the offense. Defendant recognizes and agrees that it will not seek to have payment of any monies pursuant to this plea agreement treated as a tax-deductible donation; nor will Defendant make any public statement classifying any payments as voluntary contributions; nor will Defendant seek to gain any benefit in other claims or litigation. The parties further agree that the entire $1,687,500 fine, $562,500 community service payment, and the $800 special assessment shall be paid within 30 days

of sentencing.

### 3. Restitution

The parties are not aware of any identifiable victim of the offense for which restitution is appropriate, and therefore will jointly recommend that no restitution be ordered in this case.

### 4. Forfeiture

Federal law states Defendant must forfeit to the United States all property, real and personal, which constitutes or is derived from proceeds obtained directly or indirectly from the offense. The parties are not aware of any property subject to forfeiture in this case and will jointly recommend that no property of the Defendant be forfeited.

### E. PROBATION

The parties agree and will recommend to the Court that Defendant serve a period of probation of 4 years from the date of execution of sentence. During the probationary period, Defendant agrees to fund and implement a comprehensive Environmental Compliance Plan (ECP), included as Attachment A to this plea agreement. Implementation of the ECP is a condition of probation. In the event the Court, in consultation with the United States Attorney's Office for the District of Rhode Island, the Environment and Natural Resources Division of the United States Department of Justice, the United States Probation Office, and Defendant, determines that Defendant has failed to either satisfactorily implement the ECP or has violated the terms of the ECP, the probationary term may be extended for a period to be determined by the Court.

### F. PRE-SENTENCE REPORT

The parties agree to recommend to the Court that the preparation of a Pre-Sentence Report be waived in this case, and that the matter be set for expedited sentencing promptly following the plea, as the Court's schedule permits.

16

XI

## DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK

Defendant waives (gives up) all rights to appeal and to collaterally attack every aspect of the conviction and sentence. This waiver includes, but is not limited to, any argument that the statute of conviction or Defendant's prosecution is unconstitutional and any argument that the facts of this case do not constitute the crime charged. The only exception is Defendant may collaterally attack the conviction or sentence on the basis that Defendant received ineffective assistance of counsel. If Defendant appeals, the Government may support on appeal the sentence or restitution order actually imposed.

XII

## BREACH OF THE PLEA AGREEMENT

Defendant and Defendant's attorney know the terms of this agreement and shall raise, before the sentencing hearing is complete, any claim that the Government has not complied with this agreement. Otherwise, such claims shall be deemed waived (that is, deliberately not raised despite awareness that the claim could be raised), cannot later be made to any court, and if later made to a court, shall constitute a breach of this agreement.

Defendant breaches this agreement if Defendant violates or fails to perform any obligation under this agreement. The following are non-exhaustive examples of acts constituting a breach:

      (i)     Failing to plead guilty pursuant to this agreement;

      (ii)    Failing to fully accept responsibility;

      (iii)   Failing to appear in court;

      (iv)   Attempting to withdraw the plea;

      (v)    Failing to abide by any court order related to this case;

(vi)    Appealing (which occurs if a notice of appeal is filed) or collaterally attacking the conviction or sentence in violation of Section XI of this plea agreement;

(vii)    Engaging in additional criminal conduct from the time of arraignment until the time of sentencing.

(viii)    Filing any motions, making any statements, or taking any position whatsoever in relation to any motion that the Government may file regarding a request or recommendation to the Court for an award to be paid to any persons pursuant to 33 U.S.C. § 1908(a).

If Defendant breaches this plea agreement, Defendant will not be able to enforce any provisions, and the Government will be relieved of all its obligations under this plea agreement. For example, the Government may proceed to sentencing but recommend a different sentence than what it agreed to recommend above. Or the Government may pursue any charges including those that were dismissed, promised to be dismissed, or not filed as a result of this agreement (Defendant agrees that any statute of limitations relating to such charges is tolled indefinitely as of the date all parties have signed this agreement; Defendant also waives any double jeopardy defense to such charges). In addition, the Government may move to set aside Defendant's guilty pleas. Defendant may not withdraw the guilty pleas based on the Government's pursuit of remedies for Defendant's breach.

Additionally, if Defendant breaches this plea agreement: (i) any statements made by representatives of the Defendant, under oath, at the guilty plea hearing (before either a Magistrate Judge or a District Judge); (ii) the factual basis statement in Section II.B in this agreement; and (iii) any evidence derived from such statements, are admissible against Defendant in any prosecution of, or any action against, Defendant. This includes the prosecution of the charges that are the subject of this plea agreement or any charges that

the prosecution agreed to dismiss or not file as part of this agreement, but later pursues because of a breach by the Defendant. Additionally, Defendant knowingly, voluntarily, and intelligently waives any argument that the statements and any evidence derived from the statements should be suppressed, cannot be used by the Government, or are inadmissible under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, and any other federal rule.

<div align="center">

XIII

**CONTENTS AND MODIFICATION OF AGREEMENT**

</div>

This plea agreement embodies the entire agreement between the parties and supersedes any other agreement, written or oral. No modification of this plea agreement shall be effective unless in writing signed by all parties.

<div align="center">

XIV

**DEFENDANT AND COUNSEL FULLY UNDERSTAND AGREEMENT**

</div>

By signing this agreement, Defendant certifies that Defendant and all members of the Defendant organization have read it. Defendant and all of the members of the Defendant organization have discussed the terms of this agreement with Defendant's counsel and fully understand its meaning and effect.

<div align="center">

XV

**DEFENDANT SATISFIED WITH COUNSEL**

</div>

The members of the Defendant organization have consulted with counsel and are satisfied with counsel's representation. This is Defendant's independent opinion, and Defendant's counsel did not advise Defendant about what to say in this regard.

//

//

//

<div align="center">

19

</div>

**EMMANOUIL KARAMOLEGKOS**
For Defendant
**ZEUS LINES MANAGEMENT S.A.**

_28/2/2023_
Date

**GEORGE M. CHALOS**
Counsel for Defendant

_March 22, 2023_
Date

**JOHN P. McADAMS**
Assistant U.S. Attorney

_3/24/2023_
Date

**STEPHEN DA PONTE**
Senior Trial Attorney
Environment & Natural Resources Div.

March 23, 2023
Date

**LEE H. VILKER**
Assistant U.S. Attorney
Chief, Criminal Division

_3/24/2023_
Date

20

# ATTACHMENT A

ATTACHMENT A
Environmental Compliance Plan

PURSUANT TO PLEA AGREEMENT

**United States v. ZEUS LINES MANAGEMENT S.A. ("ZEUS")**

The following standards and requirements for an ENVIRONMENTAL COMPLIANCE PLAN (ECP) have been prepared pursuant to the Plea Agreement between ZEUS LINES MANAGEMENT S.A. (hereinafter "ZEUS") and the United States (hereinafter "Government") filed in the United States District Court for the District of Rhode Island. Compliance with all of the standards and requirements of the ECP is an essential term of the Plea Agreement.

The ECP includes various provisions to ensure that all oil tanker vessels owned, operated, and/or technically managed, by ZEUS that call on ports of the United States comply with all applicable maritime environmental requirements established under applicable international, flag state and port state law, including, but not limited to the International Convention for the Safety of Life at Sea (SOLAS), the International Safety Management (ISM) Code, the International Convention for Prevention of Pollution from Ships (MARPOL), and all applicable Federal and state statutes and regulations including, but not limited to, the Ports and Waterways Safety Act (PWSA), the Act to Prevent Pollution from Ships (APPS), the Clean Water Act (CWA), and the Oil Pollution Act of 1990 (OPA 90), and with the requirements of this agreement itself. The auditing requirements of this ECP apply to all oil tanker vessels that are operated and/or technically managed by ZEUS which call at U.S. ports. As more fully set forth below, this ECP and its requirements will also apply to all oil tanker vessels that ZEUS acquires or assumes management of during the period of probation and will call at U.S. ports during the term of probation.

The Covered Vessel(s) as of the date of signing of this ECP are:

1. Adamas I        9428683
2. Galissas        9397781
3. Jupiter Star    9919632
4. Olympios        9919620

## A.     APPLICABILITY/PURPOSE

(1)     This ECP shall cover and apply to all of ZEUS operations involving oil tanker vessels calling on United States ports which are operated and/or technically managed by ZEUS on the date of sentencing (as set out above) and at any time

1

during the period of probation. Such vessels shall include all oil tanker vessels that will call at U.S. ports (hereafter referred to as the "Covered Vessels").

(2)    The ECP is not intended to replace the ISM Code, or any other applicable international legal requirement or United States statute and regulation. The purpose of this ECP is to augment the requirements of existing law by increasing and improving inspections, reviews, and audits of ZEUS operated and/or managed oil tanker vessels, shore side facilities, and operations involving said vessels; increase training of all ZEUS personnel involved with said vessels; develop and implement management and engineering controls to better manage, detect and prevent environmental violations; and require periodic reports to the United States Probation Office for the District of Rhode Island, the United States Attorney's Office for the District of Rhode Island, the Environmental Crimes Section of the United States Department of Justice, and the United States Coast Guard (collectively hereinafter "the United States") to ensure that ZEUS is following the requirements of this ECP and that all of its Covered Vessels comply with all applicable maritime environmental requirements established under applicable international, flag state, and port state law and all applicable Federal and state statutes and regulations, and that an effective environmental management system is in place to prevent recurrence of violations.

## B.    COMPLIANCE MANAGER

(1)    Within ninety (90) days of entry of the Plea Agreement, ZEUS shall designate a Compliance Manager (hereinafter "CM") who shall report directly to the Managing Director ("MD") of ZEUS. ZEUS shall provide the name of the CM to the United States. The CM could be the same individual as ZEUS's "designated person" under the ISM Code unless reasons are provided to the United States justifying why the "designated person" should not also be the CM. The CM shall be responsible for coordinating with the Third Party Auditor (hereinafter "TPA"), as more fully described below, developing and implementing all of the procedures and systems required herein, establishing and implementing training programs for the officers and crew of ZEUS operated and/or managed vessels, ensuring that reviews, audits and surveys are carried out as required and ensuring that all documents are properly maintained and that reports are made on a timely basis to the Court Appointed Monitor (hereinafter "CAM") and the United States. All reports required under this ECP shall be reviewed by the CM and signed under the penalty of perjury.

(2)    ZEUS shall establish a procedure and reporting system that requires and enables all officers, crewmembers and employees, and shore side personnel involved in the operation of ZEUS's Covered Vessels, including all persons working for ZEUS, its subsidiaries, affiliated business entities (owned wholly or partially by ZEUS) and agents of ZEUS as either direct employees or

independent contractors, to notify the CM of all violations of any applicable environmental requirements or other requirements of this ECP and to cooperate fully with the CAM and the United States in carrying out the reviewing, auditing and oversight functions required by applicable law and this ECP. ZEUS agrees to establish a procedure that makes failure to notify the CM of any violations of any applicable environmental requirements and failure to cooperate fully with the Classification Societies, the CAM and the United States in carrying out their auditing and oversight functions required by applicable law and this ECP, grounds for dismissal. ZEUS agrees not to retaliate against any officer, crewmember, employee, or shore side personnel involved in the operation of ZEUS seagoing vessels, including all persons working for ZEUS, its subsidiaries, affiliated business entities (owned wholly or partially by ZEUS) and agents of ZEUS as either direct employees or independent contractors or any entity making any such report.

(3)     The CM shall be authorized to access all records and personnel regarding all vessels subject to the ECP for the purpose of ensuring compliance with the ECP. The CM shall be authorized to implement all requirements of the ECP on all vessels subject to the ECP. The CM shall ensure that audits and surveys are carried out as required, that all documents are properly maintained and that reports are made on a timely basis to the U.S. Probation Office, CAM, the designated representative of the Coast Guard, and ZEUS. The CM position will be filled by an individual(s) with significant maritime vessel operational background, who possesses auditing experience and is thoroughly familiar with the requirements of this ECP, and is knowledgeable about domestic and international maritime environmental laws and regulations.

**CM Responsibilities:**

(a)     Development and Maintenance of Effective Training Programs

-     The CM will be responsible for developing training programs to educate and train ZEUS employees on their environmental commitment, the requirements of the ECP, the policies and procedures for complying with the ECP, and the possible consequences to ZEUS and to individuals for failure to comply with environmental laws.

-     The CM shall also provide environmental consultants and contractors of ZEUS involved in the operation of covered vessels with documents and training to make them aware of this ECP and its requirements.

(b)     Auditing and Compliance Assessment

-     Verify that the TPA conducts the review and audits required by the ECP and that the required reports are prepared.

3

    (c)    Fleet Reviews

-    Supervise annual overall reviews of the environmental compliance program and "focused" reviews of key environmental areas to promote the adoption of "best practices".

    (d)    Reporting of Non-Compliance by Employees and Crew Members

-    Establish a means by which employees may report (anonymously if the employee so desires) issues of non-compliance with this ECP and any other procedure, policy, or regulation associated with environmental protection. The CM shall review, investigate, and document in a timely fashion reports of non-compliance received from employees and shall initiate, monitor, and document all actions taken as a result of such reports. The CM shall maintain records of such reports and action taken, and shall make them available for review by the TPA and the CAM.

## C.   MASTER AND CHIEF ENGINEER

(1)    The Master of each of ZEUS vessel subject to this ECP shall ensure that prompt reports are made to the CM of any non-compliant condition associated with environmental protection of any covered ZEUS vessel.

(2)    The Chief Engineer on board all vessels subject to this ECP shall perform the following duties regarding this ECP:

-    Daily measure, monitor, record and manage shipboard generated wastes generated by engineering operations;

-    Report to the CM and cooperate with ZEUS to resolve environmental concerns, such as inoperative or ineffective pollution prevention equipment and document all efforts to do so in a log that is available for review and audit.

## D.   THIRD PARTY AUDITOR

(1)    During the probationary period, a TPA shall conduct the audits and submit the reports described in this ECP. Within ninety (90) days of sentencing, ZEUS shall submit to the Government a list of three (3) qualified candidates for the TPA position along with its recommendation for approval of one of the candidates, from which the Government will select a candidate to serve as the TPA. To the extent practicable, ZEUS will endeavor to submit candidates that have not provided auditing services to ZEUS within the last calendar year prior to the U.S. Coast Guard boarding of the M/T GALISSAS that initiated the investigation which ultimately led to the plea agreement in this case, or is not associated with the Classification Societies or Flag

Administrations to which the Covered Vessels are classed or registered. In the event that none of the candidates is found acceptable, or if the work of the TPA is unsatisfactory at any time, the Government may request that ZEUS supply additional candidates. The Government reserves the right to reject any proposed TPA. All work performed by the TPA and its auditors must be certified as being accurate and truthful. The certification shall be made with the understanding that any false information knowingly submitted is subject to prosecution under 18 U.S.C. §1001.

(2)     Qualifications. Qualified candidates for the TPA include individuals or firms that have staff capable of applying the most current International Standards Organization ("ISO") 14000 environmental management auditing criteria and have the following experience, expertise, and capabilities:

-       expertise and competence in the regulatory programs under United States and other Marine Environmental Protection Requirements; '

-       experience in performing environmental audits in industrial or maritime environments, and;

-       sufficient expertise and competence to assess whether ZEUS has adequate policies, procedures, and equipment in place to ensure compliance with this ECP and to ensure regulatory compliance, correct non-compliance, and prevent future non-compliance.

(3)     Adequacy of Staff. The TPA must have adequate staff to perform the work required of this ECP. Due to the in-depth nature of the audit criteria, persons with specialized knowledge and experience will be required to perform the audits. The knowledge, skills and abilities of the TPA and staff must align with the criteria of the audits. Experienced personnel with extensive operational, maintenance and repair of shipboard and machinery space systems, equipment, and components is a prerequisite. The TPA shall employ at least one senior level Marine Engineer (Chief, First or Second Engineer) to perform shipboard machinery space audits. The TPA shall provide the Government with the resumes of the TPA's auditors assigned to conduct shore-side and vessel audits.

(4)     Contractual Independence. During the term of probation, the TPA shall not directly own any stock in ZEUS; must have no other ongoing contractual or business relationship, other than that of the TPA, with ZEUS; and may not seek or serve in other capacities with ZEUS, unless first disclosed to the Government, the Court, and the CAM, and unless expressly approved by the Government. The TPA must exercise independent judgment and ensure that the objectives set forth in this ECP are met. ZEUS and the TPA shall notify the Government if any contractual relationships or

5

proposed contractual relationships between ZEUS and the TPA arise during the term of probation.

(5)     Functional Independence. The TPA shall function independently of ZEUS, but may communicate with ZEUS about the substance of its work. At its discretion, the TPA, may share with ZEUS its audit checklist.  The TPA may consult with, but shall not receive or request approval of any form from any employee of ZEUS regarding the development, clearance, or evaluation of any document, report, or communication of any kind, whether draft or final, required by this ECP.

## E.    ENVIRONMENTAL MANAGEMENT SYSTEM

(1)     The CM shall be responsible for establishing an Environmental Management System (EMS).  To the extent possible, the EMS shall be based upon the ISO 14001/2015 standards and shall be part of ZEUS documented management system.

(2)     Environmental Policy:

-       The EMS should be based upon a documented and clearly communicated policy. This policy should set out the ZEUS commitment towards a cleaner marine environment. It should include:

    i.     provision for compliance with environmental requirements;
    ii.    commitment to continuous improvement in environmental performance, including those areas required by this ECP;
    iii.   commitment to pollution prevention that emphasizes source reduction, to include funding and human resources necessary to effectively maintain and repair the systems, equipment and components found in machinery and cargo (deck) spaces of vessels;
    iv.    commitment to continuous reduction of environmental risks;
    v.     commitment to sharing information with external stakeholders on environmental performance.

(3)     Communication of Environmental Requirements:

The EMS must provide a means to identify, explain, and communicate all environmental requirements, and any additional best practices or industry norms which ZEUS may choose to adopt, to ZEUS employees, and other vendors, technicians or non-crewmembers who are boarding and/or sailing with the vessels and are engaged in the waste stream management of ZEUS covered vessels. The EMS must also specify procedures for incorporating changes in operations or environmental requirements into the communication plan.

(4)  Objectives and Targets:

    (a)  The EMS shall establish specific objectives and targets for:

        (i)  achieving and maintaining compliance with all applicable marine environmental protection requirements and the requirements of this ECP;

        (ii)  environmental performance demonstrating continuous improvement in regulated and non-regulated areas;

        (iii)  pollution prevention that emphasizes source reduction with respect to machinery space waste streams and effective management of cargo related wastes; and

        (iv)  sharing information with external stakeholders on environmental performance against all EMS objectives and targets, upon request.

    (b)  The EMS shall establish appropriate time frames to meet these objectives and targets. These must be documented and updated as environmental requirements change or as modifications occur in activities and structures within organizations in a manner that affects environmental performance or as a result of recommendations made by the TPA.

(5)  Structure, Responsibility and Resources:

    ZEUS will ensure that it is equipped with sufficient personnel and other resources to meet its objectives and targets. The EMS will describe in detail the procedures and steps for achieving those objectives and targets. The EMS will define the compliance roles and responsibilities of all Covered Vessels and shore side personnel involved with the operation, maintenance and repair of ZEUS vessels, and will indicate how they and other corporate personnel will be held accountable for achieving and maintaining compliance with this EMS and other applicable marine environmental protection requirements. The EMS will also establish procedures for receiving and addressing concerns raised by ZEUS employees and others regarding environmental performance and compliance.

(6)  Operational Control:

    The EMS will identify and provide for the planning and management of all of ZEUS operations and activities with a view to achieving the ECP objectives and targets. For example, vessel deck department and engine room machinery space maintenance and repair will be an important aspect in achieving and maintaining compliance and enhancing environmental performance.

(7)  Corrective and Preventive Action and Emergency Procedures:

(a)    ZEUS, through its EMS, will establish and maintain documented procedures for preventing, detecting, investigating, promptly initiating corrective action, and reporting (both internally and externally) any occurrence that may affect the organization's ability to achieve the ECP objectives and targets.

(b)    Such measures must address incidents that may have an effect on compliance with environmental requirements as well as on environmental performance in regulated and non-regulated areas, including requirements of this ECP, or other applicable marine environmental protection requirements. Examples of such situations include incinerator or oily water separator malfunctions, overflows of fuel or slop tanks, overflow of tanks within machinery spaces, fuel oil, lube oil, saltwater line failures, operator errors and other accidental releases, as well as ODME malfunctions.

(c)    The EMS must also establish documented procedures for mitigating any adverse impacts on the environment that may be associated with accidents or emergency situations. If the environmental violation or incident resulted from a weakness in the system, the EMS should be updated and refined to minimize the likelihood of such problems recurring in the future. The EMS should also, to the extent possible, provide for the testing and evaluation of emergency procedures.

(8)    Training, Awareness and Competence:

The EMS must establish procedures to ensure that all personnel (including vendors, technicians, and other non-crewmembers) who are boarding and/or sailing with the vessels and whose job responsibilities affect the ability to achieve the ECP objectives and targets, have been trained and are capable of carrying out these responsibilities. In particular, the training should highlight means to enhance the ability of such personnel to ensure compliance with environmental requirements and voluntary undertakings, the requirements of the ECP, and other marine environmental protection requirements.

(9)    Organizational Decision-making and Planning:

The EMS must describe how these elements will be integrated into the ZEUS overall decision-making and planning, in particular, decisions on capital improvements, training programs, and vessel operations, maintenance, and repair activities.

(10)    Document Control:

The EMS must establish procedures to ensure maintenance of appropriate documentation relating to objectives and targets and should also ensure that those

8

records will be adequate for subsequent evaluation and improvement of the operation of the EMS. Additionally, all records will be maintained and made available to the TPA and port and flag state personnel upon request.

(11) Continuous Evaluation and Improvement:

(a)    The EMS must include methods to perform periodic, documented and objective internal auditing of the organization's performance in achieving these objectives and targets, and on how well the ECP assists the organization in achieving those objectives and targets. This requirement is independent from the auditing requirements detailed elsewhere in this plan. The goal of these internal audits and reviews will be to allow management to continuously monitor and assess vessel systems, equipment and components, and the ability and proficiency at which vessel crew members and personnel ashore comply with the policies and procedures established by this ECP.

(b)    The EMS will identify an ongoing process for assessing when a vessel is to be taken out of service for an environmental discharge related repair.

(c)    The EMS will include organization charts, as appropriate, that identify shore side and vessel individuals having environmental performance, risk reduction, and regulatory compliance responsibilities. The charts shall also specify responsibilities of Marine and Technical Superintendents to report information related to environmental releases or inadequate performance of environmental pollution protection equipment, casualties causing internal spills, excessive waste development and leaking equipment with oil-to-sea interfaces.

(d)    The EMS will promote non-retaliatory practices and ensure that employees are not punished or otherwise suffer negative consequences for reporting violations of environmental laws, regulations, or policies.

(e)    The EMS will describe potential consequences for departure from specified operating policies and procedures, including possible termination of employment, as well as criminal/civil/administrative penalties as a result of noncompliance.

(f) The EMS will make employee compliance with environmental policies of the ECP, and other applicable marine environmental protection requirements a positive factor, and failure to comply a negative factor, in all evaluations undertaken for the performance of all ZEUS employees.

(g)    The EMS will include policies against any incentive or bonus programs based on minimizing operational costs that may negatively impact environmental compliance.

9

(h)    The EMS will describe a confidential non-compliance reporting system that is adopted to ensure that employees may quickly and confidentially report discharges, spills, environmental incidents and other environmental performance data.

(i)    The EMS will identify all operations and activities where documented standard operating practices (SOPs) are needed to prevent potential violations or unplanned waste stream releases, with a primary emphasis on vessel engine room operations, systems, equipment and components and cargo residue management.

(j)    The EMS will identify the types of records developed and maintained in support of the ECP such as reports, audit working papers, correspondence, communications, reports from the confidential system for non-compliance reporting, and identify personnel responsible for their maintenance, and procedures for responding to inquiries and requests for release of information. The EMS shall provide a system for conducting and documenting routine, objective self-inspections by ZEUS internal auditors, supervisors, and trained staff to check for malfunctions, deterioration, and inadequate maintenance of pollution prevention equipment, worker adherence to SOPs, unusual situations, and unauthorized releases.

## F.    COURT APPOINTED MONITOR

As part of the ECP, ZEUS agrees to pay for a Court Appointed Monitor (hereinafter "CAM") that will report to the Court and the United States during the entire period of probation. Within ninety (90) days of sentencing, ZEUS will submit a list of three (3) qualified candidates for the CAM from which the United States will select one of the candidates. In the event that the United States does not find one of the candidates satisfactory, it may request ZEUS to supply additional candidates. Further, if an agreement cannot be reached regarding the selection, the decision shall be left up to the Court.

(1) Qualified candidates for the CAM position must have expertise and competence in the regulatory programs under U.S. and international environmental laws, and have expertise and competence in waste stream evaluation, monitoring and control technologies, with a primary emphasis on engine room and machinery space operations, used by ZEUS to achieve and maintain compliance in respect to ZEUS seagoing vessels subject to this ECP. The CAM shall also have sufficient expertise and competence to assess whether ZEUS has an adequate Environmental Management System in place to assess regulatory and ECP compliance, to correct non-compliance, and to prevent future non-compliance.

(2)    The CAM must not directly own any stock in ZEUS, any of its subsidiaries, affiliated business entities (owned wholly or partially by ZEUS) or any agents of

ZEUS, and must have no other direct financial stake in the outcome of duties conducted pursuant to this Plea Agreement. The CAM must be capable of exercising the same independent judgment and discipline that a certified public accounting firm would be expected to exercise in auditing a publicly held corporation. If ZEUS has any other contractual relationship with the CAM, both ZEUS and the CAM shall disclose to the United States such past or existing contractual relationships.

(3)    If the United States determines that the proposed CAM does not reasonably meet the qualifications set forth in the previous paragraphs, or that past or existing relationships with the CAM would affect the CAM's ability to exercise the independent judgment and discipline required to conduct the ECP review and evaluation, such CAM shall be disapproved and another CAM shall be proposed by ZEUS within thirty (30) days of ZEUS's receipt of the United States' disapproval.

## G.    THE AUDITS

(1)    During the first year of probation, the TPA shall conduct a round of audits of ZEUS operations (vessel and shore side) including thirty-three percent (33%) of ZEUS Covered Vessels while the vessels are underway, to the maximum extent practicable. These audits should take place on voyages of short duration (2-3 days) to the maximum extent practicable. ZEUS and the TPA shall coordinate the audits to accommodate, as much as practicable, the vessels' operations and schedule. The audits shall be performed to ascertain and evaluate various aspects of ZEUS vessels: their systems, equipment and components; current practices whether documented or not; and the knowledge, skills, and abilities of ship and shore side personnel as they relate to the requirements of this ECP, and other applicable maritime environmental protection requirements. During the second year of probation, the TPA shall conduct a second set of audits of thirty-three percent (33%) of the Covered Vessels. These audits should take place on voyages of short duration (2-3 days) to the maximum extent practical. During the third year of probation, final audits shall be carried out as per paragraph I "FINAL EMS/ECP COMPLIANCE AUDIT" below.

(2)    The audits performed pursuant to this ECP shall exceed a typical SMS audit in scope and will be used to determine practices, procedures and equipment conditions not typically documented during a routine inspection by the classification society, port or flag state. The results of the audits will be used to shape and revise the Environmental Management System established by this ECP.

(3)    The audits shall meet the following specific requirements:

a.    It shall assess all waste streams developed from any system, equipment and components found in each machinery space on board ZEUS vessels. This will include observation and documentation describing the status and quantity of leakages

apparent on each system that can contribute to bilge loading. The audit will determine the status and quantify leakages stemming from:

| | |
|---|---|
| i. | all pump and valve seals and glands during operation, |
| ii. | all piping systems, flanges, gaskets, fittings and joints, |
| iii. | all equipment casings such as main and auxiliary engines, and reduction gears, |
| iv. | operation of engines, boilers, incinerators, and evaporators, |
| v. | all cargo tank stripping lines and ODME systems, and |
| vi. | all other mechanical components found aboard ZEUS vessels. |

b.    It shall assess the adequacy and performance of the Oily Water Separator (OWS) and Incinerator, Sewage System, ODME system, and any other pollution prevention equipment to handle the quantities and types of wastes developed during normal operations. To assess the performance of the OWS, the TPA shall conduct an operational test using the normal tank or bilge well supply as would be used in normal operations. The supply tank or bilge well must not be diluted. It will include an evaluation of the capacities for all tanks or containers associated with the management of sludge, bilges and oily wastes or other wastes. It will include an evaluation of documentation tracking, maintenance and repair, and modifications of all pollution prevention equipment, and notification of equipment failure to the CM, CAM, and other shore side personnel.

c.    Assess each vessel's crew ability to handle the operational, maintenance, and repair workloads in maintaining all systems, equipment, and components onboard in order to minimize waste stream development to as low as reasonably practical.

d.    It shall assess the adequacy of the policy, procedures, current practices and equipment, including storage capabilities used to manage shipboard solid wastes generated in all areas of the vessel and the effectiveness of garbage management plans.

e.    It shall assess the adequacy of the policy, procedures, current practices and equipment associated with cargo management developed during all evolutions of cargo operations.

f.    It shall assess the ability of each vessel's crewmembers to create, devise or implement an unauthorized process to dispose of a shipboard waste including regular garbage, machinery space and cargo-generated wastes.

g.    It shall assess the adequacy of each vessel's responsible crewmembers to maintain the following records and shall include a complete comparative analysis (against each other where possible) of the following records:

12

(i)     Oil Record Book,
(ii)    Engine Room Alarms,
(iii)   Tank sounding logs (if vessel does not maintain such a log, it      must start),
(iv)    Personal work records and lists related to pollution prevention   equipment,
(v)     Maintenance records related to pollution prevention equipment,
(vi)    Vendor service records related to pollution prevention      equipment,
(vii)   Bilge waste and sludge receipts,
(viii)  Deck Log,
(ix)    Garbage Record Book,
(x)     Oil to Sea Equipment Interface Logs,
(xi)    Hazardous waste manifests,
(xii)   Solid waste discharge receipts,
(xiii)  Content Monitor (OWS and ODME) calibration logs or annual      surveys by
the makers,
(xiv)   Training records related to pollution prevention,
(xv)    Inspection Documents, and
(xvi)   SMS or SQE Audit documents

h.     It shall assess the adequacy of the policy, procedures, and current practices used to store and dispose of:

(i)     Solvents,
(ii)    Degreasers,
(iii)   Cleaning wastes,
(iv)    Batteries,
(v)     Paints,
(vi)    Oily rags,
(vii)   Fluorescent and incandescent bulbs,
(viii)  Expired boiler and engine chemicals,
(ix)    Used boiler and engine chemicals,
(x)     Galley greases,
(xi)    Pyrotechnics,
(xii)   Medical supplies,
(xiii)  Contaminate fuels,
(xiv)   Used Oil and greases,
(xv)    Incinerator ash,
(xvi)   Transformer oils,
(xvii)  Contaminated refrigerants

i.     It shall assess and evaluate documentation containing the certifications that each Covered Vessel's officers understand the requirements of this ECP and shall require signed statements by all vessel officers attesting that they understand false entries in the Oil Record Book for machinery space and deck/cargo space operations

is a violation of law.

j.      It shall assess the policy, procedures, and current practices associated with the Master and Chief Engineer's capability to communicate with shore side personnel, including the CM and designated persons, and shall review such communications.

k. It shall assess the frequency and adequacy of, through interviews of crewmembers, shipboard pollution prevention and environmental protection meetings and training.

l. It shall assess the policy, procedures, and current practices used on Covered Vessels and ashore to track crewmember environmental training, as well as the availability of and access to training resources.

m. It shall assess the adequacy of existing methods for employees to report environmental concerns and evaluate the capability of a reporting individual to remain anonymous, and review processes of handling environmental complaints from crewmembers and shore side personnel.

n.      It shall assess the policy, procedures, and current practices to ensure that vessel vendors, technicians, and other non-crewmembers who are boarding and/or sailing with the vessels follow ZEUS requirements regarding pollution prevention and environmental protection.

o.      It shall assess the policy, procedures, and current practices used to manage the existing seal tracking and valve locking program, including the storage of seals and preventing the use of duplicate seals.

p.      It shall assess the policy, procedures, current practices, and equipment used to maintain refrigeration units, including availability and status of refrigerant recovery units, procedures for recovering refrigerants, and maintenance of a leak log.

q.      It shall assess the policy, procedures, current practices, and equipment related to Oil Transfer Procedures, including slops discharges, conditions of hoses, connections and transfer equipment, and shall include reviews of Declarations of Inspections.

r.      It shall assess the policy, procedures, current practices, and equipment used to handle emergency releases of hazardous fluids or pollutants on deck or within machinery spaces of vessels, including a review of the shipboard oil pollution emergency plans and evaluation of personnel performing such duties.

s.    It shall assess the policy, procedures, and current practices associated with ballast water management and invasive species requirements.

t.    It shall include a survey of all engineers serving onboard covered vessels at all levels for information on how to make the OWS, OCM, associated systems and waste management processes tamperproof and for methods on reducing or handling waste accumulations within machinery spaces. Participation shall be mandatory for all engineering personnel. The survey shall request the opinions of the vessels' engineers into their ability to adequately maintain the vessel systems, equipment and components. The survey will emphasize non-retaliation for open and honest opinions and reports of current noncompliant circumstances. The responses will be maintained in original format and made available to the CAM. The original survey responses shall be included in the Report of Findings.

(4) At the conclusion of the first year of audits, the TPA shall prepare a Report of Findings. If the TPA believes that additional time is needed to analyze available information, or to gather additional information, or to complete the Report of Findings, ZEUS may request that the Government grant the TPA such additional time, as required, which request shall not be unreasonably denied. If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Report of Findings. The Report of Findings shall be provided to ZEUS, the CAM, and the United States. Based on the Report of Findings, ZEUS shall develop and or update the Environmental Management System (EMS) as described below.

a.    Expertise and competence in the regulatory programs under United States and international marine safety and environmental laws; expertise and competence to assess whether ZEUS has adequate management systems in place to ensure applicable regulatory compliance, correct non-compliance, and prevent future non-compliance; and demonstrated capability to evaluate ZEUS's required effort and commitment in satisfying the requirements of this ECP and the EMS. ZEUS shall ensure that the TPA is provided all reports and notifications as established in this plan.

(5)    The CAM shall be assigned the following tasks and responsibilities and provide written submissions to the Court as set forth below:

a.    Review the relationship between ZEUS and the TPA and evaluate the adequacy of measures taken to ensure that the TPA acts with independence.

b.    Conduct a review and submit an annual report to the United States and ZEUS regarding each of the audits conducted pursuant to the Plea Agreement and the ECP. The CAM's reports shall provide a summary of the findings regarding the adequacy of any audits required by this ECP and adequacy of recommendations for change, as found necessary.

c.    The annual report shall also include and address any other information that the CAM is aware of which pertains to ZEUS's capabilities to meet the objectives of this ECP or any other marine environmental protection requirements.

(6)    If the CAM receives information regarding a direct violation of any applicable existing marine environmental protection requirement or requirement of this ECP, the CAM must immediately report the occurrence to the United States and the CM. At any time during the probationary period the CAM may inspect or investigate any aspect of the TPA's activities as they relate to the requirements of this plan or with respect to ZEUS's operations, and shall be provided full access to all records, audit personnel, vessels and shore side facilities as is necessary to perform its duties.

(7)    The CAM shall provide any additional reports, in both electronic and hard copy form, to the United States and ZEUS as requested by the Court or as appropriate and to include inadequacies in the audit process, violations of the terms and conditions of the ECP and EMS and any other findings of significant problems or deficiencies.

(8)    All audits performed by the TPA shall take place during an underway voyage to the maximum extent possible since that is the best way for auditors to observe ship operations and personnel. As set forth herein, the TPA is encouraged to conduct underway audits during voyages of short duration (2-3 days) to the maximum extent practical. If this is found impractical within the specified time-frame, then the CM or TPA may notify the Government and the CAM and request an exception such as auditing a different vessel, auditing at a different time, or conducting the audit when the vessel is in port. The TPA and CM should communicate frequently regarding ship movements so that the TPA can plan accordingly. Requests for exceptions should not be unreasonably refused by the interested parties.

## H.    ENVIRONMENTAL MANAGEMENT SYSTEM MANUAL

(1)    Within nine (9) months of receiving the Report of Findings for the first round of audits from the TPA, ZEUS shall prepare and/or update the procedures contained in the EMS, which shall describe and document the EMS and contain any additional EMS implementation schedules as needed to ensure complete compliance in all operations and procedures. If ZEUS believes that additional time is needed to analyze available information or to gather additional information to prepare and/or update the EMS, ZEUS may request that the Government grant it such additional time as needed to prepare and submit the EMS, which request shall not be unreasonably denied. If necessary, the United States may grant additional time in thirty (30) day increments for

completion and/or update of the EMS.

(2)    ZEUS shall submit a proposed final EMS to the CAM, the TPA, and the United States immediately upon its completion. The TPA and the United States shall provide comments on the proposed final EMS within ninety (90) days of receipt unless additional time for review is requested in writing. ZEUS shall submit a supplement to the EMS or a written response, as appropriate, within ninety (90) days of receipt of the comments. The EMS is subject to final approval from the United States, which approval shall not be unreasonably withheld.

(3)    All elements of the final EMS shall be fully implemented no later than nine (9) months following final approval by the United States. Upon receipt of final approval, ZEUS shall promptly commence implementation of the EMS in accordance with the schedule contained in the EMS Manual. ZEUS shall submit reports to the United States beginning no later than one hundred twenty (120) days following the publication of the Report of Findings by the TPA regarding the status of the development and implementation of the EMS and the results of the Review and evaluation of ZEUS operations or audits conducted pursuant to the EMS. These reports shall be made on an annual basis.

## I.    FINAL EMS/ECP COMPLIANCE AUDIT

(1)    Beginning no later than twenty-four (24) months from the date of sentencing, ZEUS shall arrange for, fund and complete a Final EMS/ECP Compliance Audit for the remaining thirty-three percent (33%) of ZEUS covered vessels that were not audited during the first two years of probation. These audits should take place on voyages of short duration (2-3 days) to the maximum extent practical. The audits are to be conducted to verify compliance with applicable environmental laws and regulations and the requirements of this EMS and ECP. During this final audit phase ZEUS shall immediately advise the CAM and the Government of any issue that comes to its attention that adversely impacts ZEUS's compliance with all applicable laws and regulations and the EMS/ECP.

(2)    The TPA will be certified by the American National Standards Institute Registration Accreditation Board or will have compatible credentials and experience in performing EMS/ECP audits.

(3)    The Final EMS/ECP Compliance Audits shall be conducted, as much as is practicable under the circumstances, in accordance with the principles set forth in ISO 9000 and ISO 14011, using ISO 14012 as supplemental guidance, and shall assess conformance with all requirements presented in the EMS and with the additional requirements of this plan. Designated United States

17

representatives may participate in the audits as observers at Government expense. ZEUS shall make timely notification to the United States regarding audit scheduling in order to make arrangements for observers to be present.

(4)    The TPA shall deliver each audit report to the CM upon completion. In addition, the TPA will deliver an Audit Report to the United States within thirty (30) days after the completion of each audit. If the TPA believes that additional time is needed to analyze available information or to gather additional information, ZEUS may request that the Government grant the TPA such additional time as needed to prepare and submit the Audit Report. If necessary, the Government may grant additional time in thirty (30) day increments for completion of the Audit Report.

(5)    The Final EMS/ECP Compliance Audit Reports shall present the Audit Findings and shall, at a minimum, contain the following information:

(a)    Audit scope, including the time period covered by the audit;

(b)    The date(s) the on-site portion of the audit was conducted;

(c)    Identification of the audit team members;

(d)    Identification of the company representatives and regulatory personnel (if any) observing the audit;

(e)    The distribution list for the Final EMS/ECP Compliance Audit Report;

(f)    A summary of the audit process, including any obstacles encountered;

(g)    Detailed Audit Findings, including the basis for each finding and the Area of Concern identified;

(h)    Identification of any Audit Findings corrected or Areas of Concern addressed during the audit, and a description of the corrective measures and when they were implemented;

(i)    Certification by the TPA that the Final EMS/ECP Compliance Audit was conducted in accordance with this document and general audit principles.

(6)    Within ninety (90) days from completion of the Final EMS/ECP Compliance Audit of a particular facility or vessel, ZEUS shall develop and submit to the United States, for review and comment, an Action Plan for expeditiously bringing ZEUS into full compliance with all applicable laws and regulations and the EMS/ECP to the extent not already completed. The Action

Plan shall include the result of any root-cause analysis, specific deliverables, responsibility assignments, and an implementation schedule. ZEUS may request that the United States permit a brief extension of the time limit stated above on a case by case basis. Such permission shall not be unreasonably withheld.

(7)    The Action Plan shall be reviewed by the United States which shall provide written comments within thirty (30) days of receipt. After making any necessary modifications to the Action Plan based on the comments, ZEUS shall implement the Action Plan in accordance with the schedules set forth therein. Within thirty (30) days after all items in the Action Plan have been completed, ZEUS shall submit a written Action Plan Completion Confirmation to the United States.

## J.    NON-COMPLIANCE

a.    This EMS/ECP does not in any way release ZEUS from complying with any applicable international conventions and treaties, State or Federal statutes and/or regulations, the ISM Code, or other applicable international maritime conventions or treaties and does not limit imposition of any sanctions, penalties, or any other actions, available under those international conventions and treaties, State or Federal statutes and regulations, the ISM Code, or other international maritime safety conventions or treaties.

b.    The EMS/ECP shall be part of the Plea Agreement and adherence to it will be a condition of probation. Failure to comply with any part of this EMS/ECP may be considered as Non Compliance.    ZEUS within ninety (90) days from the identification of Non Compliance shall develop and submit to the United States, for review and comment, an Action Plan for expeditiously bringing ZEUS into full compliance. The Action Plan shall be reviewed by the United States which shall provide written comments within thirty (30) days of receipt.    After making any necessary modifications to the Action Plan based on the comments, ZEUS shall implement the Action Plan in accordance with the schedules set forth therein. Within thirty (30) days after all items in the Action Plan have been completed, ZEUS shall submit a written Action Plan Completion Confirmation to the United States.    Failure of ZEUS to implement agreed Action Plan may be a violation of the Plea Agreement and may be grounds for the revocation or modification of ZEUS's probation. Should the United States seek to revoke or modify ZEUS's probation based on ZEUS's refusal to pay valid charges for the TPA or CAM and/or its failure to provide the TPA or CAM access to vessels, facilities, personnel, or documents, and/or as the result of any disagreement regarding any of the provisions of this EMS/ECP, ZEUS shall have the right to fully contest such revocation before the appropriate U.S. District Court.

## K.    CM/VESSEL MASTER RESPONSIBILITIES

The Master of any ZEUS vessel covered under this ECP, shall ensure that timely reports are made to the CM of any non-complaint condition of any ZEUS vessel. The CM shall ensure that timely reports are made to the United States of any non-compliant condition of any of ZEUS vessel. ZEUS shall establish that enforcement of and employee compliance with the EMS/ECP, ISM Code, MARPOL, and all applicable State and Federal safety and environmental statutes and regulations is an important positive factor and that failure to comply with such policies, regulations, and laws will be a negative factor in all appropriate personnel evaluations.

## L.    BOARD OF DIRECTORS

ZEUS shall ensure that at least yearly ZEUS's MD receives and reviews reports from the CM and any applicable report from the TPA and CAM concerning the implementation of this EMS/ECP, including environmental compliance, EMS implementation, and manager, officer, and crew training. Copies of those portions of the meeting agendas and internal company reports concerning these items shall be included in the reports to the United States.

## M.    TRAINING REQUIREMENTS

(1)    The CM will be responsible for developing training programs to educate and train ZEUS Covered Vessels and shore-side employees associated with the operation and management of its Covered Vessels. ZEUS will appoint a Fleet Training Officer, who may be the CM, to ensure that the requirements of this section are met.

(2)    Training shall occur annually for all employees and be performed by qualified instructors before an employee assumes his or her duties. The training shall consist of pertinent sections of this ECP, the EMS, and existing marine environmental protection requirements. The training shall include shipboard-related technical and practical information associated with pollution prevention and the operation, maintenance and repair of pollution prevention equipment and systems, and be appropriate for the work responsibilities and department in which an employee works. The training must include discussion of the consequences to ZEUS and its employees for failure to comply with the requirements of this ECP, EMS, and existing marine environmental protection requirements.

(3)    A basic initial training program shall be provided to Covered Vessels employees currently onboard vessels in an effort to promptly mitigate pollution risk and ensure environmental protection. Additionally, employees must receive shore side training prior to returning to a vessel on a new contract.

(4)     The training shall include instruction regarding:

(a)     Corporate environmental compliance structure, including the CM and contact information.

(b)     Comprehensive overview of this ECP, the EMS, and other marine environmental protection requirements.

(c)     The reporting system used to report non-compliance.

(d)     Sanctions and consequences for violations such as remedial training, suspension, termination, and civil and criminal liability.

(e)     Pollution prevention and minimization programs specifically relating to steward, deck, and engine department procedures and operations.

(f)     All requirements set forth in the Engineering section of this ECP.

(g)     Position specific training in the operation, maintenance and repair of oily water separators, incinerators, oil content discharge monitoring equipment, and other pollution prevention equipment.

(h)     Procedures for solid and hazardous waste segregation and storage, disposal, and reporting of releases.

(i)     All other shipboard environmental protection related procedures examined and described in the required initial review.

(5)     All new crewmembers reporting to work onboard ZEUS Covered Vessels shall receive training within fourteen (14) days of beginning to work on board the vessel. ZEUS shall maintain documentation onboard each Covered Vessel verifying that all officers and crewmembers working on the vessel have received the required training. Such documentation shall be made available to the TPA, CAM, and the United States upon request.

(6)     The Chief Engineer and Chief Officer onboard each Covered Vessel listed shall prepare independent written verification that all engine room and deck crew members have received the training required by this EMS/ECP. All engine room crewmembers shall sign and date a statement acknowledging completion of the training. This written verification, together with the signed acknowledgment, shall be completed semi-annually and maintained in the engine control room of each vessel.

## N.     ENGINEERING REQUIREMENTS

(1)    Time of Implementation. Unless otherwise stated, all of the Engineering Requirements set forth below shall be implemented on Covered Vessels as soon as is reasonably practicable, but in any event not later than six (6) months from the date of sentencing.

(2)    Environmental Control System

a.    ZEUS shall implement an Environmental Control System or ECS to help prevent unauthorized usage of connections within the engine room, machinery spaces, and cargo/deck spaces. Under the ECS, ZEUS shall require crew members to use numbered seals, locks, or welds (on flanges) to prevent the unauthorized connection to, and discharge through, piping systems that are or may be connected to the oily bilge system or and overboard discharge connections, to include those used in cargo tank stripping/washing. Seals used as part of the ECS shall be non-reusable and uniquely numbered.

b.    An ECS Seal Log shall be maintained by the Chief Engineer that records each time a seal is affixed or removed in the engine room and machinery spaces, including the date, time, seal number removed, seal number affixed, personnel involved, and reason for any seal removal or replacement. The keys used to open locks utilized as a part of the ECS shall be controlled. This ECS Seal Log shall be different from the ECS Seal Log used by the Chief Officer in the cargo and deck spaces.

c.    An ECS Seal Log shall be maintained by the Chief Officer that records each time a seal is affixed or removed in the cargo or deck spaces and pump room, including the date, time, seal number removed, seal number affixed, personnel involved, and reason for any seal removal or replacement. The keys used to open locks utilized as a part of the ECS shall be controlled. This ECS Seal Log shall be different from the ECS Seal Log used by the Chief Engineer in the engine room and other machinery spaces.

d.    Any existing seals that are found to have deteriorated or had their numbers partially or completely erased shall be replaced immediately, with the reason for replacement entered in the respective ECS Seal Log.

e.    The CM will be responsible for ensuring that no duplication of ECS seal numbers occur and will maintain documentation indicating which series of environmental seals have been supplied to each vessel.

(3)    Tank Piping

a.    To prevent unauthorized manipulation of waste management systems within the engine room and machinery spaces, each Covered Vessel shall maintain

22

Classification Society-approved drawings that reflect all approved modifications made to waste management systems.

b. ZEUS shall establish and maintain approval procedures for any modifications made to shipboard waste management tanks or their systems. Those procedures shall require prior CM approval for all non-emergency modifications. Any emergency modification must be reported to the TPA and CAM promptly after work is performed. Prompt approval or removal of any emergency modifications after the emergency has ended shall be required.

c. Within ninety (90) days of sentencing, the CM shall ensure that notification is given to all Covered Vessels regarding the prohibition against using unauthorized stub pipes, cross connections, or piping on engine room waste and cargo tank stripping/washing systems.

d. Personnel working on Covered Vessels shall promptly notify the CM of the existence and purpose of any unauthorized stub pipes, cross connections, or piping on engine room waste and cargo tank stripping/washing systems in a Covered Vessel. Within fourteen (14) days of receiving such information, the CM shall ensure that it is relayed to the Interested Parties, along with any findings and corrective actions.

e. Classification Society-approved drawing(s) representing the current physical layout of the systems shall be available on board. The Chief Engineer shall maintain documentation explaining the reason(s) for any changes/modifications made after the date of sentencing for engine room/machinery space systems. The Chief Officer shall maintain documentation explaining the reason(s) for any changes/modifications made after sentencing for cargo tank stripping/washing systems. Copies of this documentation and drawing(s) shall be maintained aboard the vessel and provided to the TPA and CAM upon request.

f. To prevent unauthorized usage of bilge water tanks or oily waste tanks, ZEUS shall require that ECS seals or locks be placed on all tank hatches, valves, or flanges that could allow for an external connection to the system. The ECS Seal Log or Lock Log shall track any time a processed bilge water tank or oily waste tank is opened.

(4) Bilge-Main Cross Connections

a. Within sixty (60) days of sentencing, the CM shall ensure that notification is provided to all Covered Vessels regarding the prohibition against the non-emergency usage of cross connections from engine room bilge mains to the suction piping of larger pumps which may be referred to as the "fire and general service pump" or "fire, bilge and ballast" pump. The notification shall state that such usage is similar to bypassing the OWS equipment and is strictly prohibited, except in the case of an

emergency. Any method to discharge overboard via the soot collection tank and soot eductor must be disabled and locked out.

b.      The deck plates above or near the locations of these cross connections or other interconnected systems and the valve bodies and associated hand wheels shall be painted international orange. A brightly colored sign with three-inch letters shall be permanently fixed nearby, stating – "Bilge System Piping Crossover – Emergency Use Only."

c.      To prevent unauthorized usage of those valves, ZEUS shall require that ECS seals be placed on such valves. The ECS Seal Log shall track any time a crossover to the bilge main is opened. If a valve is remotely operated from the engine control room, the associated push button or switch must be unable to be used without breaking an environmental seal

(5)     Emergency Bilge Suctions

a.      All other bilge suction valves not connected to the bilge main, and independent emergency suctions to the vessel's engine room bilges, like those which may be connected to sea water circulating pumps, shall be painted international orange on all Covered Vessels and labeled in a manner similar to "Emergency Bilge Suction - Emergency Use Only." The valve wheels will also have a numbered and logged ECS seal capable of breakaway during emergencies, testing, and maintenance.

(6)     Blank Flanges

a.      To prevent unauthorized connections within the engine room and machinery spaces of vessels, every blank flange connected to overboard piping, on systems such as saltwater service, main engine raw water cooling or other systems, shall be permanently secured, removed, or fitted with numbered ECS seals through the flange bolts that will break when such bolts are removed, to prevent unauthorized connections and discharges. The ECS seals used shall be numbered and records kept in the ECS Seal Log. Alternative sealing methods, such as numbered foil-coated sticker seals for flanges, may also be used.

b.      The blank flange securing the bilge and sludge transfer system shore connection discharge valve at the discharge stations shall also require controls as part of the ECS.

(7)     Additional OWS / OCM Requirements

a.      The sample line from the OWS discharge connection to the sample/flush line control valve will be painted a bright color to distinguish it from other tubing and piping in the area. The line must be routed so it is clearly visible to the extent possible

for its entire length. No additional connections or tees of any kind may be added to the line.

b.      ZEUS shall have the OCM manufacturer or contracted distributor perform annual testing that ensures the OCM requires a sample flow for normal operation and control.

c.      Every Covered Vessel shall perform monthly operational tests of the OWS and OCM in the presence of the Chief Engineer, and one other engineer. The test shall be logged in the vessel's ORB. The Chief Engineer shall send a report to the assigned superintendent and CM.

d.      In addition to the operational test performed in the presence of the TPA, every Covered Vessel shall conduct an annual operational test of the OWS system under actual operational conditions. This test shall include one (1) full hour of continuous processing of the contents of the Bilge Holding Tank without dilution, and without dilution of the sample line leading to the OCM,[1] conducted by the Chief Engineer in the presence of a ZEUS shore-side representative or Class surveyor, and any other engine room personnel assigned responsibility for the operation and/or maintenance of the OWS. If an actual discharge is not feasible due to the location of the vessel or the levels of the bilge holding tanks, then the discharges shall be through a recirculation line, in accordance with the procedures approved by the vessel's Classification Society and provided further that soundings of the bilge holding tanks shall be made before and after the test and shall be made a part of the test record and providing that any alarms shall be recorded and made part of the test record. All of the above shall be recorded in the Oil Record Book (Part I). In the event that the assessment determines the OWS is not operating as designed, then an immediate report shall be made to the cognizant superintendent, CM, the Interested Parties, the TPA, and the CAM, with a copy of the engine room alarm printout to be retained.

e.      Every Covered Vessel shall inspect the OWS source tanks every six (6) months and remove any accumulated oil if necessary. The OWS source tanks shall be cleaned during dry docking or sooner if necessary. Such cleaning shall be logged in the PMS.

f.      Anytime an OCM is subject to maintenance or calibration, such actions shall be logged in the ORB.

(8) Additional ODME Requirements

a.      ZEUS shall have the ODME manufacturer or contracted distributor perform annual testing that ensures the ODME requires a sample flow for normal operation

---

[1] A test performed where the source tank is diluted with water or does not contain bilge water is strictly prohibited.

and control.  Any ODME that allows overboard discharge without a sample flow is prohibited.

b.      Every Covered Vessel shall perform monthly operational tests of the ODME in the presence of the Chief Officer, and one other officer.  The test shall be logged in the vessel's ORB.    The Chief Officer shall send a report to the assigned superintendent and CM.

c.      As part of the operational test performed in the presence of the TPA, every Chief Mate/Officer and any other officer responsible for ODME operation shall demonstrate that they understand how to properly operate the system, to include discharging through the ODME in "Automatic" mode. The Chief Officer and any other officers responsible for ODME operation shall demonstrate to the TPA's satisfaction that they understand how to operate the ODME, and that they understand that discharges through the ODME in "Manual" mode are prohibited.

d.      Anytime an ODME is subject to maintenance or calibration, such actions shall be logged in the ORB.

(9)  Recordkeeping

a.      All sounding records required by this section shall be maintained and available to auditors for the duration of the ECP.

b.      A portable pump log shall be maintained documenting all instances of onboard use of a pneumatic or portable pump.  The log shall include a description of the fluid pumped, its source, and the tank or location where the fluid was transferred.  The log shall include the date and time the pump was used and shall identify the person(s) who checked out the pump and operated it.

(10)  Oil Record Book Entries

a.      Entries made into the ORB shall be made and signed by the officer or officers in charge of the operation, reviewed and countersigned by the Chief Engineer (for ORB Part I) or Chief Officer (ORB Part II), and each completed page shall be signed by the Master.

(11)  Tank Sounding Records

a.      ZEUS shall provide each Covered Vessel with a standard format electronic tank sounding log that includes, for each sludge tank, bilge tank associated with bilge water and/or oil residues (sludge), and cargo waste/washing/stripping tank, the tank name/designation, tank capacity, sounded quantity and time and method of sounding. Soundings from each tank shall be taken at least daily.  The individual taking the

tank sounding shall make entries in the electronic tank sounding log and sign each entry electronically.

(12)  Fuel Oil/Lube Oil Purifier Settings and Line Breaks

a.    ZEUS shall have a standard system for monitoring fuel oil and lube oil management on a monthly basis, including the operation of the fuel oil and lube oil purifiers.  Any incident involving ships receiving proven poor-quality fuel shall be noted in the Engine Room Log or similar record once it becomes known, and such entries shall refer to the relevant bunker receipts.

b.    Any extraordinary operations (such as increased frequent draining of fuel oil service and settling tanks, draining engine lube oil sump tanks of excessive water) shall be recorded in the official Engine Room Log and explained to the extent possible, and the records made available for inspection.

c.    All oil leaks exceeding manufacturer or historical volumes, including any fuel and/or lubricating oil leaks resulting from mechanical failure shall be reported to the CM.

(13)  Oil-to-Sea Interfaces

a.    ZEUS shall establish a logbook for each Covered Vessel for monitoring equipment having oil-to-sea interfaces which relies on mechanical tension, hydrostatic pressure on the seal and the surface tension between water and oil to minimize oil releases to the sea.  Such interfaces may include stern tube bearings, stabilizers, controllable pitch propeller systems, maneuvering thrusters, propulsion pods, and similar equipment whereby the leakage of a sealing component may cause a loss of operating medium into the waters surrounding the vessel.    Any replenishment of oil into the head tanks, operating systems reservoirs, or other receivers associated with this equipment shall be logged, regardless of the quantity involved.  Ingress of water or drainage of water into or from these systems must also be logged, as far as practicable.

b.    Any extraordinary operations (such as frequent draining of interface operating systems, tanks and spaces of excessive water) shall be recorded in the official Engine Room Log, explained to the extent possible, and the records made available for inspection.

(14) Fleet Operational Survey

a.    Within six (6) months of the date of sentencing, ZEUS shall issue a survey to all Masters on its Covered Vessels for information on how to improve MARPOL compliance, to include what new equipment, maintenance, parts, and procedures

would be beneficial. This survey shall include a request for the frank opinions of the vessels' officers as to their ability to adequately maintain the vessels' systems, equipment, and components will be included. The survey will emphasize non-retaliation for open and honest opinions and reports of current noncompliant or unsatisfactory circumstances.

b.     The CM shall evaluate the responses and establish a plan to evaluate, test, and implement viable ideas for improvement. The CM shall also address, to the extent practicable, legitimate maintenance concerns suggested by the vessels' Masters and Officers.

c.     A summary of the reported information and corrective actions will be provided to the Interested Parties, the CAM, and the TPA.

## O.    DOCUMENTATION AVAILABLE FOR INSPECTION

The CM shall ensure that all documentation required by this EMS/ECP is maintained and available for inspection by the TPA and CAM and the United States. The Master of each Covered Vessel under this ECP, shall maintain on board the vessel, all records required by International conventions and treaties including SOLAS, the ISM Code, and MARPOL and applicable State and Federal statutes and regulations and any additional documents required under this EMS/ECP, such as crew training records, and will make these records available to the TPA and CAM and the United States upon request. A summary of this information and any explanation, where appropriate, shall be included in the reports to be submitted to the United States by the TPA.

## P. CHANGES TO OPERATION/MANAGEMENT

The parties recognize that during the term of probation, the number and identity of vessels operated and/or managed, by ZEUS may increase or decrease. Any vessel, the operation or management of which is assumed by ZEUS and that will call at United States ports shall be subject to the terms and conditions of this EMS/ECP. Any vessel removed from the operation or management by ZEUS shall be excluded from the scope of the EMS/ECP. ZEUS agrees that it will immediately (but in no event later than twenty (20 working days, excluding weekends or holidays, following a change) notify the United States of any change in name, flag of registry, recognized organization, ownership or class society of any such of ZEUS vessels, to include the operation or management of which is assumed by ZEUS. ZEUS agrees that this EMS/ECP shall remain in effect for all of the aforesaid vessels regardless of changes in the vessels' flag of registry, recognized organizations, name, or class society, so long as the vessels are managed or operated by ZEUS and may call at United States ports. ZEUS shall notify the United States before any vessel is released from

the requirements of the EMS/ECP due to a change in operation or management. ZEUS shall ensure that any vessel that it assumes operational or management, of during the course of probation is audited in accordance with this ECP, and that this audit takes place no later than one hundred and eighty (180) days after assuming technical management of the vessel.

## Q. SELF-ENFORCEMENT

ZEUS further agrees that it will undertake and implement the necessary procedures to ensure that this EMS/ECP is diligently complied with.

## R. REVISIONS/MODIFICATIONS

The requirements of this EMS/ECP, including the dates and time periods mentioned herein, shall be strictly complied with. Should ZEUS be unable to comply with any of the deadlines, ZEUS shall immediately notify the United States in writing of the reason(s) for non-compliance and propose a revised timetable. The United States shall then determine whether the revised timetable should be accepted.

## S. REPORTS

All reports, documents and correspondence required under this EMS/ECP to be sent to the United States shall be sent to the following offices:

(a)    U.S. Department of Justice
       Environmental Crimes Section
       Attn: Stephen Da Ponte
       150 M Street, NE, Suite 4.126, Washington, D.C. 20002
       Email: Stephen.daponte@usdoj.gov

(b)    U.S. Attorney's Office
       District of Rhode Island
       Attn: John P. McAdams
       One Financial Plaza, 17th Floor
       Providence, RI 02903
       Email: John.P.McAdams@usdoj.gov

(c)    U.S. Coast Guard Commandant (CG-INV-1)
       Office of Casualty Investigations & Analysis
       Attn: Designated Representative of the Coast Guard  2703 Martin Luther King Jr. Ave, SE Stop 7501
       Washington, D.C. 20593-7501
       Email: HQS-SMB-CG-INV-ECP@uscg.mil (less than 10GB)

(d)    U.S. Probation Department
       District of Rhode Island
       2 Exchange Terrace, 3rd Floor
       Providence, RI 02903